IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs July 24, 2018 at Knoxville

**RICHARD BRYANT LONG v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Lawrence County**
**No. 34492     Stella L. Hargrove, Judge**

_____

**No. M2018-00113-CCA-R3-PC**

_____

The petitioner, Richard Bryant Long, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received effective assistance of counsel at trial. Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT L. HOLLOWAY, JR., JJ., joined.

John S. Colley, III, Columbia, Tennessee, for the appellant, Richard Bryant Long.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Brent A. Cooper, District Attorney General; and Christi Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Facts and Procedural History**

In 2015, a Lawrence County jury convicted the petitioner of the Class A felony of rape of a child for which he is currently serving a twenty-five-year sentence in the Tennessee Department of Correction. On direct appeal, the petitioner challenged the trial court's admission into evidence of a video recording of the victim's forensic interview. In denying his challenge, this Court affirmed the petitioner's conviction and, in doing so, provided the following summary of the underlying facts:

> This case arises from the [petitioner's] rape of his twelve-year-old
> step-daughter, the victim, [ ]. A Lawrence County grand jury indicted the
> [petitioner] for rape of a child, and at the [petitioner's] trial on this charge,

the following evidence was presented: [The victim] testified that she was twelve years old at the time of trial and that, at the time of the rape, the [petitioner] was married to her mother. The [petitioner] came to live with her family when she was one year old, and she called him "daddy" after that. She testified that, at the time of these events, she lived with her mother, the [petitioner], her little sister, and her older brother. [The victim] stated that, when her little sister was born, the [petitioner] began coming into her room in the middle of the night and touching her "private areas, [her] chest areas, and [her] legs, and rub against [her]." She stated that the [petitioner] took her to "the farm" and did "those things" in the middle of the night there too. [The victim] stated that the [petitioner] would "do it" a couple of times a week.

[The victim] stated that, on Easter 2012, during a visit to Carlton Doss's farm, she and the [petitioner] loaded Doss's four-wheeler onto a trailer and drove it to a barn on Doss's property. At the barn, the [petitioner] urinated while the victim stayed in the truck. When he returned to the truck, his penis was protruding from his pants. [The victim] informed the [petitioner] of this fact, and the [petitioner] responded that he did not realize he was exposed.

[The victim] said that, after learning that some cows were loose in the woods, the two drove the four-wheeler [into] the woods. The [petitioner] asked [the victim] if she wanted to play a game. The [petitioner] told her to close her eyes and open her mouth, and he "rubbed his pinky on the sides of [the victim's] mouth." [The victim] told the [petitioner] to stop and moved his hand. The [petitioner] "rubbed his private areas around [the victim's] chest." [The victim] told the [petitioner] that she was going to tell her mother, and the [petitioner] "got mad." He then took her to a creek or a pond and told her to remove her clothing and get into the water, offering to swim with her. [The victim] said that she wanted to go home and that the [petitioner] eventually took her home.

[The victim] testified that her older brother had basketball practice on Mondays and Thursdays after school, and [the victim] went home with the [petitioner] and her little sister. At home, [the victim] would sit on the couch, and the [petitioner] would sit down next to her and "put his hand on [her] lap and he would rub against [her] knees. And sometimes he would pull against [her] clothes or tug on them. And he would try to mess with [her] or touch [her] in [her] privates." [The victim] was "scared" to go

home with the [petitioner] on the afternoons when her brother had basketball practice.

[The victim] testified that she shared a room with her little sister but that, when she was younger, her little sister slept in another room. During that time, the [petitioner] came into [the victim's] room at night and rubbed against her and laid his hand on her lap. [The victim] testified that the [petitioner] rubbed her privates in the "front," her chest, and her "upper lap." The [petitioner] also "rubbed his private" with his hand, usually after he was finished "messing with" [the victim]. She testified that she could see his "private" and that "greenish-white goo" came out of it and onto his hand. [The victim] told the [petitioner] that she was going to tell her mother, and the [petitioner] responded that he would hurt [the victim] or put her in the hospital if she told her mother.

[The victim] clarified that the [petitioner] touched her private area with his fingers on the "outside." He "tr[ied] to go inside" of her private area, but [the victim] squeezed her legs tight to stop him. [The victim] eventually told her mother and grandmother what the [petitioner] had been doing, and the police were contacted.

On cross-examination, [the victim] agreed that she did not cry out for help to the other adults in the house when the [petitioner] touched her. She reiterated that the [petitioner] touched her in her room in the middle of the night a couple of times a week for five years. She stated that she saw the "goo" come out of the [petitioner's] privates one or two times and that one time it got on the side of her mouth. [The victim] agreed that she had never liked the [petitioner] and did not want her mother to marry him. [The victim] agreed that she had testified to several things she did not reveal in her forensic interview.

Nathan Neese testified that he was employed by the Lawrence County Sheriff's Office and that he became involved with this case on the day a forensic interview was conducted with [the victim]. Lieutenant Neese interviewed the [petitioner]. The [petitioner] denied [the victim's] allegations but said he sometimes wore boxer shorts around the house, that the shorts did not have a button in the crotch area, and that sometimes his penis came out.

[The victim's] mother testified that [the victim] told her about the [petitioner's] actions and that she confronted him. He denied the

allegations, and they fought over the issue. The next day, [the victim's] mother visited her own mother and sister, [the victim's] aunt, at her mother's house. [The victim's] aunt told [the victim's] mother that she would call the police about what [the victim] had reported. [The victim's] mother stated that she believed [the victim's] allegations and that she had kept the [petitioner] away from [the victim] ever since.

On cross-examination, [the victim's] mother agreed that she never heard [the victim] call out to her for help in the middle of the night or had any idea that this was going on between the [petitioner] and [the victim].

Dawn Bradley testified that she worked for the Department of Children's Services ("DCS") and that she interviewed [the victim]. [The victim] told her that the [petitioner] had touched her "inappropriately." A forensic interviewer at a child advocacy center later interviewed [the victim]. Law enforcement was alerted of the interview, which was video recorded.

During a jury-out hearing, the State advised the trial court of its intention to introduce the video recording of the forensic interview, on the basis that it was necessary to rebut what the victim's testimony [was] on cross-examination about her conversation with the forensic interviewer. Defense counsel objected to the video, saying that its introduction was not necessary to rebut the few questions asked of the victim about what she told the forensic interviewer. The trial court concluded that defense counsel had opened the door for the introduction of the video because defense counsel asked the victim about her testimony that was inconsistent with what she told the forensic interviewer. The trial court further stated that the video was related to material issues in this case.

Still on the subject of the forensic interview, defense counsel argued that "the statute require[d] some qualifying things to be done" before the video was introduced. Both parties and the trial court referred to and read aloud Tennessee Code Annotated section 24-7-123, which governs the admissibility of a video interview with a child by a forensic interviewer regarding sexual contact. Defense counsel argued that there were "specific requirements . . . about the forensic examiner" including that the interviewer had to be licensed in a certain way. The forensic interviewer, Katie Brazier, then testified that she interviewed [the victim] in 2012, when she was employed by Kid's Place, a child advocacy center. Ms. Brazier testified that Kid's Place was properly certified as a child advocacy center

- 4 -

by the State of Tennessee at the time of the interview. Ms. Brazier stated that she had graduated from the University of North Alabama with a bachelor's degree in social work in 2005. After completing her degree, Ms. Brazier was employed by DCS for eight months and then was employed with Kid's Place for six and a half years, where she conducted forensic interviews. At the time of trial, Ms. Brazier had been employed by DCS for two years.

Ms. Brazier clarified that at the time of her interview with [the victim], Ms. Brazier had six years of experience doing forensic interviews. Ms. Brazier testified about her forensic training, which consisted of forty hours of "basic forensic interview training," which she completed at the National Child Advocacy Center. Ms. Brazier did an internship during her training at Kid's Place, during which she "shadowed" a forensic interviewer. Ms. Brazier's curriculum vitae was admitted as an exhibit. The trial court found that Ms. Brazier met the qualifications and specific requirements found at Tennessee Code Annotated section 24-7-123(b)(3) and found specifically that Ms. Brazier had "completed the forensic training as required" and had "worked under a forensic interviewer, prior to becoming one herself." Defense counsel lodged a contemporaneous objection prior to the trial court's admission of the video, while acknowledging that the trial court had "satisfied all the requirements."

In the presence of the jury, Jill Howlett testified that she was employed at Our Kid's Center in Nashville, an outpatient child advocacy clinic that conducted forensic medical examinations of children who had been sexually abused. Ms. Howlett interviewed [the victim] for a medical history and about the alleged sexual encounters with the [petitioner]. [The victim] reported to Ms. Howlett that the [petitioner] had touched her private area with his hands, both on her skin and over her clothes. She stated that he touched the inside and outside of her private area and that this happened more than one time. [The victim] reported that she saw "gray nasty stuff" come out of the [petitioner's] penis when he was "giving [her] a shower."

Katie Brazier testified that she was employed by Kid's Place in 2012 and interviewed [the victim]. Ms. Brazier testified to her training and qualifications as a forensic interviewer, consistent with her testimony during the prior jury-out hearing. Ms. Brazier stated that she had also completed advanced forensic interview training. She stated that she had conducted over 2,000 interviews while employed at Kid's Place. At this

point, the video recording of Ms. Brazier's forensic interview with [the victim] was played for the jury.

On cross-examination, Ms. Brazier agreed that what [the victim] had told her during the interview differed from what [the victim] had testified to, in some aspects. Ms. Brazier recalled that [the victim] told her she was scared to tell the doctor who examined her some of the things that had happened.

For the [petitioner], Sandra Anderson, his mother, testified that she knew [the victim] as her step-granddaughter. She said that [the victim] had visited her home too many times to count and that she had visited [the victim's] home. She estimated that the two had been together "[h]undreds" of times. Ms. Anderson said that she had caught [the victim] lying "so many times." [The victim], she said, lied about her brother mainly but so often that Ms. Anderson would not believe anything that [the victim] said. Ms. Anderson recalled that, after the [petitioner] moved out of the home, she went to bring pizza to [the victim] and her mother. [The victim] showed her a closet full of new clothing and told her that she received the clothing in exchange for her accusations against the [petitioner].

During cross-examination, Ms. Anderson testified that she usually believed [the victim's] brother's recount of events over [the victim's] version. She described him as "mellow" and unlikely to start trouble.

John Anderson, the [petitioner's] stepfather, testified that he had helped to raise the [petitioner] since the [petitioner] was four years old. He said he knew [the victim] through the [petitioner] and had seen her over 100 times. The last time he saw [the victim] was after the [petitioner] and [the victim's] mother separated. Mr. Anderson testified that [the victim] liked to "stretch the truth" and wanted to be the center of attention. Mr. Anderson described a conversation during which [the victim] told him that [the victim's] mother and another man were colluding with her biological father to "get rid" of the [petitioner]. Mr. Anderson said he was present at [the victim's] house on Easter 2012 from 10:30 a.m. until 4:00 p.m. He said the [petitioner] and [the victim] never left the home alone.

During cross-examination, Mr. Anderson testified that he later learned that [the victim's] father was incarcerated. He said he was not surprised to learn that the [victim's] father was not scheduled for parole

until 2033. After this conversation, Mr. Anderson said he told the [petitioner] to "look for trouble."

Donna Howell, the [petitioner's] girlfriend, testified that the two had dated for three years as of the time of trial. Ms. Howell said that she had engaged in intercourse with the [petitioner] on numerous occasions and, on those occasions, she never noticed him to have ["]green goo" coming from the end of his penis. She said that he had not given her any sexually transmitted diseases. Ms. Howell testified that the [petitioner] had been around her young niece and her nephew and they had no complaints about his behavior. During cross-examination, Ms. Howell testified that the [petitioner] did not live in a home with her niece or nephew.

Carl Doss testified that he employed the [petitioner] for a long period of time. He said that, Easter morning 2012, he went to church and came home for an Easter egg hunt. He said that he did not see the [petitioner] or [the victim] at his home that day and that no one drove his four wheeler that day. During cross-examination, he agreed that he did not know what happened at his home while he was at church.

*State v. Richard Bryant Long*, No. M2015-02093-CCA-R3-CD, 2016 WL 4487953, at *1-4 (Tenn. Crim. App. Aug. 25, 2016), *perm. app. denied* (Dec. 15, 2016) (internal footnote omitted).

After the denial of his direct appeal, the petitioner filed a timely petition for post-conviction relief. In the petition, the petitioner alleged he received ineffective assistance at trial because trial counsel "failed to introduce evidence that the victim maintained, and the State of Tennessee originally maintained, that there was no allegation, much less proof, of penetration." The petitioner also alleged trial counsel "failed to object to the admission of the victim's forensic interview, even though the forensic interviewer had not complied with the requirements of T[ennessee] C[ode] A[nnotated] [section] 24-7-123," which outlines the requirements that must be met before a video recording of a forensic interview of a child regarding sexual contact may be introduced at trial. The post-conviction court held an evidentiary hearing during which the social worker who conducted the forensic interview of the victim, Katie Brazier, and trial counsel both testified.

Ms. Brazier stated she worked as a forensic interviewer at A Kid's Place for six and a half years beginning in August of 2006. During her employment, she conducted the interview of the victim concerning the allegations made against the petitioner. Regarding the requirements of Tennessee Code Annotated section 24-7-123, Ms. Brazier

confirmed she received at least eight hours of supervision by a qualified forensic interviewer of children prior to handling the victim's forensic interview, she participated in a peer review system while employed at A Kid's Place, and she obtained at least fifteen hours of continuing education each year. *See* Tenn. Code Ann. § 24-7-123 (b)(3)(D), (E), (H).

Trial counsel then testified, stating he represented the petitioner after being appointed to the case in 2010. At trial, he was satisfied with Ms. Brazier's qualifications under Tennessee Code Annotated section 24-7-123. Though trial counsel believed Ms. Brazier satisfied the statutory requirements necessary to admit the forensic interview into evidence, he preserved his objection to its admission for appeal.

Trial counsel reviewed a certified copy of a Petition to Adjudicate Dependency and Neglect filed on July 24, 2012 in Lawrence County juvenile court by Dawn Bradley of DCS. The petition detailed the victim's allegations against the petitioner, noted she was a victim of severe abuse, and sought a restraining order against the petitioner. Trial counsel acknowledged that within the sworn petition, Ms. Bradley detailed the petitioner's abuse of the victim, noting: "[The victim] denies [the petitioner] putting his penis in her mouth or any penetration." Because the victim testified to penetration at trial, trial counsel admitted that pointing out the victim's denial of the same in the dependency and neglect petition would have benefitted the petitioner's defense. However, trial counsel "just forgot" about the petition during trial. As such, the petition was not admitted into evidence or used during the cross-examinations of Ms. Bradley or the victim. Trial counsel believed his failure to utilize the dependency and neglect petition "[fell] below the *Strickland* standard." *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

During cross-examination, trial counsel explained he successfully suppressed portions of the petitioner's statement at trial. Specifically, the trial court "suppressed the part of [the statement] where they asked [the petitioner] had he ever put his finger in the child's mouth and run it around in a circle. [The petitioner] indicated that he had." Based upon this portion of the petitioner's statement, the petitioner and trial counsel "agreed that if that statement came in, it was going to hurt him."[1]

Trial counsel cross-examined the victim about the issue of penetration at trial. He remembered the victim testified that something penetrated her mouth. Trial counsel explained:

---

[1]At the end of trial, the State elected to pursue the allegation against the petitioner that occurred in the victim's bedroom during which the petitioner "put his finger in [the victim's] mouth, and sometimes it would feel like -- a balloon."

- 8 -

I don't remember [the victim] ever saying she saw a penis go into her mouth. I think what she testified was she had to close her eyes and he ran his tongue he ran his finger around the inside of her lips and she felt something long and rubbery or plasticy go in her mouth but she never said it was a penis as opposed to a balloon or a piece of soap or anything else.

Trial counsel again admitted, "the fact that [the victim] had initially, when she reported this, [said] that she hadn't been penetrated was something that should have been relayed to the jury."

During re-direct examination, trial counsel acknowledged two additional discrepancies between the victim's initial allegations detailed in the dependency and neglect petition and her testimony at trial. Specifically, trial counsel noted in the petition, the victim did not mention "green goo" or that she felt something like a balloon in her mouth, both of which were discussed during the victim's trial testimony. Trial counsel believed it would have been helpful to cross-examine the victim, Ms. Bradley, and Ms. Brazier about the discrepancies in the victim's story. However, though he did not ask about these discrepancies in particular, trial counsel stated he did cross-examine the victim and Ms. Brazier about whether or not the petitioner penetrated the victim. Further, trial counsel stated he questioned the victim and Ms. Brazier about the inconsistencies that emerged during trial.

After its review of the evidence presented, the post-conviction court denied the petition. This timely appeal followed.

## Analysis

On appeal, the petitioner argues trial counsel was ineffective for not addressing the discrepancies between the victim's trial testimony and her initial description of abuse found in the dependency and neglect petition. Specifically, the petitioner asserts trial counsel failed to utilize the dependency and neglect petition to cross-examine the victim or Dawn Bradley, the DCS case manager who filed the petition, regarding the issue of penetration. The State contends the post-conviction court properly denied the post-conviction petition because the petitioner "failed to prove by clear and convincing evidence that cross-examining the victim and Ms. Bradley about her statement [from] the [dependency and neglect] petition was prejudicial." Following our review of the record and submissions of the parties, we agree with the State and affirm the judgment of the post-conviction court.

To obtain relief in a post-conviction proceeding, a petitioner must demonstrate that his or her "conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. *See* Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *See Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo*, with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo*, affording a presumption of correctness only to the post-conviction court's findings of fact. *See id.*; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id.* Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.*; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing

professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Here, the petitioner asserts trial counsel was ineffective for failing to use the dependency and neglect petition to establish the differences between the victim's description of abuse found in the petition and her trial testimony. According to the petitioner, at trial, the victim testified the petitioner penetrated her whereas in the petition, "the victim denied [the petitioner] ever put his penis in her mouth or any other type of penetration." The petitioner suggests trial counsel's failure to utilize the dependency and neglect petition rendered his assistance ineffective in that he did not attack the victim's credibility to its full extent. The petitioner also claims trial counsel should have cross-examined Ms. Bradley regarding the dependency and neglect petition. Upon our review of the record, however, it is clear trial counsel adequately attacked the victim's credibility at trial regarding the issue of penetration and no prejudice resulted from his failure to use the dependency and neglect petition to address the same. The petitioner is not entitled to relief.

At the post-conviction hearing, trial counsel stated he forgot to utilize the dependency and neglect petition to identify inconsistencies in the victim's abuse allegations at trial, thus rendering his assistance ineffective. The post-conviction court disagreed and summarized its factual findings as to the discrepancies in the victim's statements as it related to trial counsel's performance, as follows:

> [Trial counsel] testified his performance fell below the standard of criminal defense demanded by *Strickland*. The [trial] [c]ourt disagrees. In spite of prior statements made by [the victim] at age nine, she testified of oral penile penetration before the jury. The [trial] [c]ourt recalls her testimony as strong, unequivocal and convincing. The jury had her testimony at trial as well as statements made by her in the forensic interview. The jury believed [the victim's] testimony and found [the] [p]etitioner guilty of child rape beyond a reasonable doubt. This trial produced a just result.

Upon our review of trial counsel's performance as a whole, we agree with the post-conviction court's assessment of the petitioner's claims. While trial counsel did not use the dependency and neglect petition during his cross-examination of the victim and Ms. Bradley, trial counsel thoroughly challenged the issue of penetration with both witnesses during cross-examination by questioning them about the differences between the victim's trial testimony and statements made during her forensic interview. A review of the record indicates the victim's statements regarding the petitioner's abuse differed in detail throughout the investigation into the same, however, nothing suggests trial counsel was ineffective in handling the discrepancies in the victim's story at trial.

Throughout the investigation and trial, the victim testified to numerous instances of abuse occurring over a period of multiple years. At trial, the victim stated the abuse consisted of the petitioner "rub[bing] [the victim's] privates in the 'front,' her chest, and her 'upper lap.' The [petitioner] also 'rubbed his private' with his hand, usually after he was finished 'messing with' [the victim]. [The victim] testified that she could see [the petitioner's] 'private' and that 'greenish-white goo' came out of it and onto his hand." *Richard Bryant Long*, 2016 WL 4487953, at *2. Further, the victim testified the petitioner "put his hand over [the victim's] eyes, and he would put his finger in [the victim's] mouth, and sometimes it would feel like a -- balloon." While the victim provided these specifics at trial, the dependency and neglect petition indicates she omitted information about the "greenish-white goo" and the petitioner penetrating her mouth. Additional trial testimony indicates the victim provided different details to the various professionals who participated in the investigation of the petitioner's abuse after it was initially disclosed. As a result, trial counsel attacked the victim's credibility at trial through cross-examination. Though he did not specifically address the dependency and neglect petition, trial counsel was effective during cross-examination in that he elicited an admission from the victim and Ms. Brazier that the victim did not disclose the same details to Ms. Bradly, Ms. Brazier, or the jury at trial. As a result of trial counsel's efforts, the State introduced the forensic interview of the victim in order to rehabilitate her. Thus, the record indicates trial counsel effectively attacked the victim's credibility by identifying the various statements made by the victim in describing the petitioner's abuse. As noted by this Court on direct appeal, though trial counsel attacked the victim's credibility, the jury chose to believe her nonetheless. *Richard Bryant Long*, 2016 WL 4487953, at *6. Accordingly, we are not persuaded that a specific attack on the victim's credibility through the dependency and neglect petition, which like the forensic interview contradicted and corroborated the victim's trial testimony, would have changed the outcome of the petitioner's trial. The petitioner is not entitled to relief.

The petitioner has not proven trial counsel was ineffective in failing to attack the victim's credibility through the use of the dependency and neglect petition, and the

petitioner cannot show how the alleged deficiency of trial counsel prejudiced his trial. Similarly, the petitioner has failed to show how trial counsel's failure to address the dependency and neglect petition during Ms. Bradley's testimony prejudiced his trial. See *Strickland*, 466 U.S. at 687. The petitioner is not entitled to post-conviction relief for his claim of ineffective assistance of counsel.

## Conclusion

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE